**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WELLS FARGO BANK, N.A., solely in its capacity as Trust Administrator of MASTR Adjustable Rate Mortgages Trust 2007-3, | Case No. 13 Civ. 06781(PGG) (HP) |
| Interpleader Plaintiff, | Judge Paul G. Gardephe |
| v. | Magistrate Judge Henry Pitman |
| WALES LLC, ASSURED GUARANTY MUNICIPAL CORP. (f/k/a FINANCIAL SECURITY ASSURANCE INC.), THE DEPOSITORY TRUST COMPANY, CEDE & CO., as registered Holder of certain Certificates and nominee name of the Depository Trust Company, and DOES 1 through 100, beneficial owners of certain Certificates, | Electronically Filed |
| | Oral Argument Requested |
| Interpleader Defendants. | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF WALES LLC'S MOTION FOR JUDGMENT ON THE PLEADINGS PURSUANT TO RULE 12(C)

JONES DAY
Jayant W. Tambe
Kelly A. Carrero
Alex P. McBride
222 East 41st Street
New York, New York 10017
(212) 326-3939

*Attorneys for Interpleader Defendant Wales LLC*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................... 1

ARGUMENT ....................................................................................... 2

    A.    The Provisions Of The PSA And Policy Relating To The Reimbursement Rights Of The Certificate Insurer Provide Only For Subrogation ........................ 2

        1.    The "Commitment Letter" .................................................... 3

        2.    "Certificate Insurer Reimbursement Amount" In The Pro-Supp.............. 4

        3.    "Certificate Insurer Reimbursement Amount" In The PSA ..................... 5

        4.    Article XII Of The PSA & The Policy.................................... 6

    B.    Reimbursement Rights Beyond Subrogation Would Contravene The Certificate Subordination Structure In MARM 2007-3 ......................................... 7

    C.    The Transaction Unambiguously Limits Assured To Subrogation Only At Specified Waterfall Steps................................................................ 11

    D.    A General Reimbursement Right Would Turn The Entire Concept Of "Insurance" On Its Head ................................................................ 14

CONCLUSION.................................................................................... 15

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*,
No. 652837/2011, 2014 WL 3288335 (Sup. Ct. N.Y. Cnty. July 3, 2014) ...........................14

*Citibank, N.A. v. Morgan Stanley & Co. Int'l*,
724 F. Supp. 2d 398 (S.D.N.Y. 2010)................................................................................. 3-4

*Dunloy v. BGC Fin., L.P.*,
No. 12 Civ. 1253(NRB), 2012 WL 6700070 (S.D.N.Y. Dec. 19, 2012)..................................3

*Europacific Asset Mgmt. Corp. v. Tradescape Corp.*,
No. 03 Civ. 4556(PKL), 2005 WL 497787 (S.D.N.Y. Mar. 2, 2005) ......................................4

*Great Am. Ins. Co. v. United States*,
575 F.2d 1031 (2d Cir. 1978)................................................................................................8

*M&T Bank v. LaSalle Bank Nat'l Ass'n*,
852 F. Supp. 2d 324 (W.D.N.Y. 2012)............................................................................... 4-5

*Millgard Corp. v. E.E. Cruz/NAB/Fronier-Kemper*,
No. 99 Civ. 2952(LBS), 2003 WL 22741664 (S.D.N.Y. Nov. 18, 2003) .............................13

*Simas v. Merrill Corp.*,
No. 02 Civ. 4400(RCC), 2004 WL 213013 (S.D.N.Y. Jan. 29, 2004) ............................ 13-14

*State Farm Fire & Cas. Co. v. Advanced Chimney, Inc.*,
No. 13 Civ. 4608(ADS), 2014 WL 4438899 (E.D.N.Y. Aug. 11, 2014) ................................6

*Wells Fargo Bank. N.A. v. ESM Fund I LP et al.*,
785 F. Supp. 2d 188 (S.D.N.Y. 2011).......................................................................... passim

*Wells Fargo Bank, N.A. v. Fin. Sec. Assurance Inc.*,
504 F. App'x 38 (2d Cir. 2012) ...................................................................................1, 2, 6

*World Trade Ctr. Props. LLC v. Certain Underwriters at Lloyd's*,
906 F. Supp. 2d 295 (S.D.N.Y. 2012)..................................................................................13

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(c) ...................................................................................1, 3, 12

Interpleader Defendant Wales LLC ("Wales"), by and through its undersigned counsel, respectfully submits this reply memorandum of law in further support of its motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure (the "Motion").[1]

## PRELIMINARY STATEMENT

Assured's opposition does nothing to rebut the dispositive fact in this interpleader:  the Trust's operative contracts do not provide Assured with *any* affirmative reimbursement right other than through subrogation.  Assured again argues that a singular term in Trust's operative documents – "Certificate Insurer Reimbursement Amount" – gives it a broader reimbursement right.  But the Second Circuit has already ruled under basic principles of contract interpretation that this ***identical*** term under an ***identical*** insurance policy limits Assured to subrogation as a matter of law.  *See Wells Fargo Bank*, *N.A. v. Fin. Sec. Assurance Inc*., 504 F. App'x 38, 40 (2d Cir. 2012).  This alone resolves the limited question in dispute.

In its opposition, Assured attempts to complicate this case by mischaracterizing isolated provisions or by alleging improper and irrelevant parol evidence, all part of an attempt to win discovery so it can work with its now-ally UBS, the transaction's sponsor, to retroactively rewrite the plain terms of the Trust contracts.  Those tactics fail because the plain terms of the Trust's governing documents provide only for subrogation.  Substantially all of the so-called "ambiguous" terms to which Assured refers are identical to those in *ESM* and, in any event, identify distinctions without a difference.

Assured's position is not only unsupported by the plain contract terms, but also is patently implausible.  Assured relies on contract rights that simply do not exist, and seeks to

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in Wales' moving brief ("Br.") or in the PSA.  References to "Ex." are to exhibits to the Declaration of Jayant W. Tambe, dated September 24, 2014, and to the Declaration of Jayant W. Tambe, dated November 17, 2014, filed contemporaneously herewith.

undermine the structure and priority of the certificates issued by the Trust.  In so doing, Assured turns basic principles of insurance on their head.  By contrast, Wales' position is supported by the plain terms of the Trust's contracts, it is consistent with the structure and priority of the Trust's certificates, and it is in accord with Assured's position as a certificate insurer.  As in *ESM*, this Court should grant the Motion and rule that as a matter of law Assured's reimbursement right is limited to subrogation.

## ARGUMENT

### A.     The Provisions Of The PSA And Policy Relating To The Reimbursement Rights Of The Certificate Insurer Provide Only For Subrogation

The issue in this interpleader is a narrow one:  whether the terms of the MARM 2007-3 Trust confer upon Assured, as Certificate Insurer, a general reimbursement right separate and independent from, and in addition to, subrogation.  As explained in Wales' moving brief, the operative contracts governing Assured's rights and obligations to the Trust – the PSA and the Insurance Policy – along with the Pro-Supp, governing the marketing of the Trust's certificates, do not provide Assured with ***any*** affirmative right to reimbursement other than through subrogation.  (*See* Br. at 6-8.)  Unable to deny this fundamental fact, Assured is again forced to focus on the term "Certificate Insurer Reimbursement Amount" and argue, as it did in *ESM*, that this term alone provides it with broader reimbursement rights.  But, the Second Circuit has already ruled that "Certificate Insurer Reimbursement Amount," when construed against Assured's limited rights under an identical insurance policy, "by their plain meaning provide[s] Assured only with subrogation rights in the certificates it insures."  *Fin. Sec. Assurance Inc*., 504 F. App'x 38 at 40; *see also* Br. at 7-8.  The lower court's decision in *ESM* reached the same conclusion in reconciling identical terms in the MARM 2006-OA2 PSA.  *See Wells Fargo Bank. N.A. v. ESM Fund I LP et al*., 785 F. Supp. 2d 188, 196-97 (S.D.N.Y. 2011) ("Assured is to be

2

repaid, 'but only from the sources and in the manner provided herein for the payment of such principal and interest,' PSA § 12.05, to wit, through subrogation."). In construing the identical contract terms at issue here between the identical transaction parties, this Court should rule the same.[2]

In the face of this controlling contractual language, Assured advances a number of disparate arguments that are erroneous, irrelevant, and/or provide no distinction from *ESM*, as explained below.

        **1.**    ***The "Commitment Letter"***

To dodge the plain terms of its own agreement with the Trust, Assured misdirects this Court's attention to Assured's alleged negotiations with UBS, and in particular a so-called commitment letter between UBS and Assured, as evidence of some broader reimbursement right. (*See* Opp. at 25-26.) But consideration of such negotiations is both improper and irrelevant. As an initial matter, the PSA and Policy by their own terms are the complete and integrated contracts governing Assured's rights and obligations in the Trust. (*See* Br. at 2-3, *infra* at 6-7.) By contrast, far from part of an "integrated agreement," the commitment letter (at most) memorializes the negotiations between two private parties. Under these circumstances, the commitment letter and similar "evidence" of Assured's and UBS's purported contract negotiations cannot be considered in resolving this Rule 12(c) Motion. *See Citibank, N.A. v. Morgan Stanley & Co. Int'l*, 724 F. Supp. 2d 398, 404-05 (S.D.N.Y. 2010) (granting motion for

---

[2] Assured continues to refer to the Second Circuit's decision in *ESM* as "non-binding." (*See* Opp. at 21.) But district courts routinely rely on appellate court authority, even if non-published, to resolve substantially similar contract terms. *See, e.g., Dunloy v. BGC Fin., L.P.*, No. 12 Civ. 1253(NRB), 2012 WL 6700070, at *2 (S.D.N.Y. Dec. 19, 2012) (analyzing an arbitration provision that was substantially identical to one resolved in another Second Circuit case: "in evaluating this question, we are bound by the Second Circuit's decision") (citing *White v. Cantor Fitzgerald, L.P.*, 393 Fed. App'x 804 (2d Cir. 2010)).

judgment on the pleadings:  "Allegations and evidence extrinsic to the contractual documents," which included evidence of the parties' negotiations, "have not been considered."); *Europacific Asset Mgmt. Corp. v. Tradescape Corp.*, No. 03 Civ. 4556(PKL), 2005 WL 497787, at *11 n.4 (S.D.N.Y. Mar. 2, 2005) (declining to consider a commitment letter to prove the parties' intent in the operative agreements).  Independently, even if it could otherwise be considered, the commitment letter, as a private negotiation between two parties, is not binding on the rights or obligations between Assured and the Trust or its constituents like the Senior Certificateholders. None of the Trust's holders were parties to the commitment letter, and its terms were never even communicated to them.  For all these reasons, the commitment letter is simply irrelevant to resolving the contract question presented in this Trust interpleader.[3]

### 2.  *"Certificate Insurer Reimbursement Amount" In The Pro-Supp*

Assured argues that it is entitled to reimbursement beyond its express subrogation rights because the Pro-Supp defines "Certificate Insurer Reimbursement Amount" as "any amounts owing to Assured in the insurance agreement," which "insurance agreement" Assured implies is the "commitment letter" reached between Assured and UBS.  (*See* Opp. at 3, 25.)  This argument fails in multiple respects.  *First*, because "Certificate Insurer Reimbursement Amount" is already defined in the PSA, the Trust's indenture, the PSA's definition trumps any contemplated definition in the marketing materials as a matter of law.  *See M&T Bank v. LaSalle Bank Nat'l Ass'n*, 852 F. Supp. 2d 324, 332-33 (W.D.N.Y. 2012) (holding that indenture terms contemplated

---

[3] Although the commitment letter cannot be considered, its terms are perfectly consistent with the terms of the Trust documents defining Assured's reimbursement rights solely through subrogation.  Contrary to Assured's gloss, the letter contemplates only what the Trust documents actually provide that:  "[Assured] will be entitled to be subrogated to the rights of the holders of the Insured Certificates with respect to the amounts for which [Assured] has made a payment under the Policy" and further, to obtain the aforementioned subrogation, "[Assured] shall be entitled to reimbursement pursuant to the priority of payment set forth in the Final Prospectus Supplement."  *See* Assured CCs [Dkt. No. 27], Ex. A ¶ 2.

in offering materials could not be construed to override the rights and obligations in the indenture itself as a matter of law). In fact, the *Pro-Supp itself* expressly states that "[t]he following summaries do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the provisions of the [PSA]." (Pro-Supp [Ex. 3] at S-61.) *Second*, even if the Pro-Supp's definition is considered, Assured's proffered interpretation is implausible, requiring the Court to read in a private "commitment letter" with UBS referenced nowhere in the Trust, as opposed to Assured's *actual* insurance agreement with the Trust and its holders – the Policy and Endorsement – for the term "insurance agreement." *Third*, as Assured admits, this very same Pro-Supp definition was before the court in *ESM* but did not alter that court's decision. In fact, Assured **admitted** in *ESM* that the Pro-Supp and PSA definitions were the same. (*See* Assured Reply *ESM* [Ex. 7] at 7, n.6.)[4]

### 3.    *"Certificate Insurer Reimbursement Amount" In The PSA*

Assured argues that the PSA somehow provides it with separate reimbursement rights because (a) waterfall provisions entitle Assured to Certificate Insurer Reimbursement Amounts "to the extent remaining unpaid," and (b) the definition of "Certificate Insurer Reimbursement Amount" includes the phrase "any amount owing." These arguments also fail.[5]

---

[4] If anything, the Pro-Supp's definition further confirms that Assured's reimbursement rights are based in subrogation. The definition provides for "any amounts owing to [Assured] under the insurance agreement for reimbursement," and the terms of Assured's insurance agreement provide only for reimbursement in subrogation. (*Cf*. Opp. at 22 (claiming, in plain conflict with the Second Circuit's conclusion in *ESM*, that the insurance policy modifies only "claims paid" in the PSA definition).)

[5] In addition, Assured's throw-away argument that the term "reimbursement" must be different from "subrogation" because both terms are found in the PSA was expressly rejected in *ESM*: "[t]hat 'reimbursement' has a different dictionary definition than 'subrogation' is of little importance here. . . . [t]he two terms are not mutually exclusive; Assured is to be repaid, 'but only from the sources and in the manner provided herein for the payment of such principal and interest'" through subrogation. *ESM*, 785 F. Supp. 2d at 196-97 (citing PSA § 12.05). In fact, the terms are used *together and interchangeably* in the PSA. (*See* PSA [Ex. 2] at 25 (definition

As an initial matter, the terms are substantially identical to those considered by the *ESM* court (*see, e.g.*, Comparison of MARM 2007-3 and MARM 2006-OA2 terms [Ex. 6] at 2, 6-7) and, in any case, are fully consistent with Assured's limited subrogation right.  The phrase "to the extent remaining unpaid" simply references any outstanding amounts owing to Assured as subrogee for past insurance payments for such Distribution Date.  Assured's theory to the contrary – based on some "phantom" subrogation provision found elsewhere in the waterfall – is implausible.  (*See infra* at 13-14.)  Further, the phrase "any amounts owing" is qualified in the definition by the "Certificate Insurer Policy," which provides only for subrogation.  *See Fin. Security Assurance Inc.*, 504 F. App'x at 40.  This latter qualification also moots Assured's argument that the phrase "any amounts" somehow indicates that Assured has broader reimbursement rights than in *ESM* due to the nature of the particular waterfalls.  (*See* Opp. at 22-23.)  As in *ESM*, the Policy provides that such "amounts" are subrogation payments of principal or interest, as applicable.[6]

### 4.    *Article XII Of The PSA & The Policy*

Assured is mistaken that Article XII of the PSA and the Policy – identical in all respects

---

of "Certificate Principal Balance") (providing that "solely for the purposes of determining [Assured's] rights as **subrogree** . . . the Certificate Principal Balance of any Insured Certificates shall be deemed not to be reduced by [Assured's insurance payments of principal] unless such amounts have been **reimbursed** to [Assured] pursuant to Section 4.02.") (emphasis added).)

[6]Assured contends that because the definition provides for the payment of interest, reimbursements must not be related to subrogation payments.  (Op. at 23-24.)  But the definition in *ESM* contained the same provision and, in any case, such provision is consistent with Assured's subrogation rights:  It simply entitles *Assured* (not the Insured Certificates) to whatever interest accrued on the late payments once Assured covered such shortfall.  *See, e.g.*, Policy [Ex. 4] at 2 ("Guaranteed Distributions") (providing that Assured is *not* liable for interest accrued on late interest payments once covered under the Policy); *see also State Farm Fire & Cas. Co. v. Advanced Chimney, Inc.*, No. 13 Civ. 4608(ADS), 2014 WL 4438899, at *10 (E.D.N.Y. Aug. 11, 2014) ("Because the right of subrogation is one of indemnification, interest should accrue from the date [the insurer] actually paid the insured, as distinct from the date of the insured's injury.") (internal quotation marks omitted).

to those in *ESM* – do not limit Assured's reimbursement rights to subrogation.  (Opp. at 24.)

Article XII is the *only* section of the Trust's integrated indenture that addresses Assured's rights.

*See ESM*, 785 F. Supp. 2d at 197 (noting that Article XII is "the section of the PSA expressly

devoted to the rights of the Certificate Insurer").  And, the Policy itself states that it "sets forth in

full the undertaking of [Assured], and shall not be modified, altered or affected by any other

agreement or instrument, including any modification or amendment thereto."  (Policy [Ex. 4] at

1.)[7]

### B.   Reimbursement Rights Beyond Subrogation Would Contravene The Certificate Subordination Structure In MARM 2007-3

The terms of the Trust's governing documents provide only for reimbursements to

Assured through subrogation.  But even if this were not the case, the Trust's subordination

structure confirms Assured's limited subrogation right.  Assured attempts to distinguish *ESM* by

making the now-tired point that the Trust here has three payment waterfalls, whereas the trust in

*ESM* had only one.  (*See* Opp. 13-14.)  As such, Assured contends that there are no

"subordination issues" present under its proffered interpretation.  *Id*. at 2.  Assured is wrong.

As explained in Wales' moving brief (*see* Br. at 4-5, 11, 17-19), Assured's (admitted)

capture of tens of millions of dollars from the Interest Waterfall has given it (and thus its

subrogors, the Senior Support Certificateholders) rights and preference over the Super Senior

---

[7] Separately, the definition of "Net Monthly Excess Cashflow" does not include an offset based on general reimbursements by Assured from the Interest Waterfall or Principal Waterfall, further confirming that Assured's reimbursements are limited to subrogation.  (*See* Br. at 19-20.) Assured now argues that because the *Pro-Supp's* summery definition of this term includes "Certificate Insurer Reimbursement Amount," Assured *is* somehow entitled to general reimbursement rights.  But, only the PSA's definition governs (*see supra* at 4-5) and, even if the Pro-Supp's definition is considered, the term "Certificate Insurer Reimbursement Amount" means only reimbursements "under the Certificate Insurance Policy," that is, through subrogation.  (*See supra* at 2-3.)  Thus, the Pro-Supp's definition is fully consistent with the remaining Trust provisions and provides only that Net Monthly Excess Cashflow is generated after, *inter alia*, subrogation payments to Assured in lieu of the Insured Certificates.

Certificates to recover principal amounts, in plain violation of the PSA's subordination structure under the Excess Funds Waterfall as between the Super Senior Certificates and Senior Support Certificates.  (*See* PSA [Ex. 2] §§ 4.02(c)(3) and 4.03(c)(3) (payments of Unpaid Realized Loss Amounts).)  And, contrary to Assured's position, the end result is no different than in *ESM*. Each dollar applied to reimburse Assured in respect of principal payments made on the Senior Support Certificates reduces the amount of funds that would otherwise be available to pay the principal balance of the Super Senior Certificates under the Excess Funds Waterfall.  To date, Assured has benefited by this diversion of funds directly at the expense of the holders of the Super Senior Certificates in an amount in excess of $47 million.  In the end, both schemes equally undermine the Trust's express subordination structure in respect of principal losses and recoveries.[8]

Unable to rebut this fact, Assured again obfuscates with misleading or irrelevant arguments that, in any case, draw on terms substantially identical to those at issue in *ESM*. Assured first argues that because its reimbursements supposedly are from the Trust's "excess spread" (a) such reimbursement cannot undermine the Trust's subordination structure because the Pro-Supp lists "subordination" separately from "excess interest" when describing the transaction's various forms of credit support, and (b) such reimbursement is expressly authorized

---

[8] Assured misses the point in arguing that "reimbursement of Assured in the Interest Funds waterfall does not result in the Insured Certificates receiving any principal distributions." (Opp. at 15, n.6.)  As subrogee of the Insured Certificates, payments to Assured are in effect payments to the Insured Certificates.  *See Great Am. Ins. Co. v. United States*, 575 F.2d 1031, 1034 (2d Cir. 1978) (subrogation "is an exclusively *derivative remedy* which depends upon the claim of the insured") (emphasis added).  Thus, as the *ESM* court noted, "[i]f Assured's interpretation were correct, then the Super Senior certificates would be structurally subordinated to the Senior Support certificates" because "the Senior Support holders would be paid out in full by the Policy, and Assured would be paid back in full before the Super Senior certificates are repaid."  *ESM*, 785 F. Supp. 2d at 196.  The same is true here with respect to reimbursements of principal losses under PSA §§ 4.02(c) and 4.03(c).

under the transaction documents as "fees and expenses of the trust." (*See* Opp. at 15-16.)[9]

Assured is mistaken on both counts. *First*, there is no basis in any of the Trust documents to

conclude that excess interest was intended to be applied in a manner that would up-end the basic

subordination structure of the Trust. As explained above, diverting such funds to first reimburse

Assured for principal violates the Trust's express subordination structure at PSA §§ 4.02(c)(3)

and 4.03(c)(3) by flipping the priority for reimbursement of principal between the Super Senior

and Senior Support Certificates. (*See also* Pro-Supp [Ex. 3] at S-21 (expressly providing that

excess interest will be used absorb realized losses).)[10] *Second*, and in any case, "fees and

expenses" cannot plausibly be interpreted to authorize tens of millions of dollars in principal

reimbursements to Assured, giving rise to substantial losses to Super Senior Certificates and,

with it, lawsuits such as this one. To the contrary, the Pro-Supp makes clear that "fees and

expenses" do ***not*** include Assured's purported reimbursement amounts. That document contains

an entire section entitled "Fees and Expenses" that, notably, lists Assured's premium as the only

"fees payable" to the Certificate Insurer, and does not include the Certificate Insurer ***at all*** when

listing "expenses." (*See* Pro-Supp [Ex. 3] at S-104 to S-105.) If anything, therefore, the Pro-

Supp's provisions on "fees and expenses" *further confirm* that Assured's reimbursement right

from the Interest Waterfall is limited to subrogation.[11]

---

[9] MARM 2006-OA2 contained the same "excess spread" provisions cited by Assured here. (*See* MARM 2006-OA2 Pro-Supp [Dkt. No. 33-2] at S-21.)

[10] By contrast, paying built-in fees and expenses owed to administrators or service providers of the Trust (*e.g.*, trustee fees) does not have the effect of diverting such principal payments between the various classes of certificateholders and/or their subrogees like Assured. (*Cf.* Opp. at 15.)

[11] The PSA also confirms that "fees and expenses" has nothing to do with Assured's claim to broader reimbursements. The PSA invokes the phrase "fees and expenses" only when describing fees and expenses of other transaction parties (*see, e.g.*, PSA [Ex. 2] §§ 8.05, 9.05) and provides that certain of those fees and expenses may be withdrawn from the Trust's Distribution Account separate and apart from distributions down the payment waterfalls. *See,*

Separately, Assured argues that the Trust's waterfalls undermine Wales' subordination argument because (a) Interest-Only Certificates are paid before the Super Senior Certificates under the Interest Waterfall, (b) the Super Senior and Senior Support Certificates are paid concurrently in certain waterfall sections, and (c) one Senior Support Certificate (2-2A6) allegedly has priority over the Super Senior Certificates under the Subgroup 2-2 Principal Waterfall.  (*See* Opp. at 16-17.)  But, these features are completely irrelevant to the Trust's subordination provisions concerning principal losses and recoveries at issue here, including PSA §§ 4.02(c) and 4.03(c).  (*See* Br. at 4-5, 19.)  Moreover, with respect to points (a) and (b), the waterfall at issue in *ESM* had the same structure and, with respect to point (c), the Subgroup 2-2 Principal Waterfall actually provides that principal distributions to the Super Senior Certificates and the 2-2A6 Senior Support Certificates are to be made on a *concurrent* basis.[12]

Assured also argues that the standard administrative exemption that bars subordination of ERISA-eligible RMBS certificates, Exemption 83-1, is irrelevant because the Trust's Super Senior Certificates also qualify under an individualized ERISA exemption known as the "Underwriter's Exemption" that, assuming multiple other conditions are met, allows for subordination.  (*See* Opp. at 17-18.)  But, it is far from clear that any of the Trust's certificates actually *qualified* under that exemption.  *First*, the Pro-Supp merely provides that the Underwriter's Exemption is "expected" to apply to the Super Senior Certificates (*see* Pro-Supp [Ex. 3] at S-176), but warns plan fiduciaries to make their own determination.  *Id*.  *Second*, no subordinated securities in respect of allocated losses issued by the Trust (*see* Opp. at 18) were

---

*e.g.*, *id.* § 3.10(b).  The PSA does *not* contain comparable provisions regarding the withdrawal of Assured's "reimbursement" payments from the Distribution Account.

[12] This payment regime is unsurprising.  The Class 2-2A6 Certificates (like the 2-2A3 Certificates) share some common features with the Super Senior Certificates, including a AAA rating "without regard" to the insurance policy, and a correspondingly lower coupon rate than even certain Super Senior Certificates.  (*See* Pro-Supp [Ex. 3] at S-8, S-9.)

*actually designated as ERISA-eligible*.  (*See* PSA [Ex. 2] at 18 (ERISA-Restricted Certificates).)

Thus, the Trust's operative document strongly suggest that *none* of the Trust's securities actually

qualified under the Underwriter's Exemption, and only qualified under the standard Exemption

83-1.[13]  (*See id.; see also* Pro-Supp [Ex. 3] at S-175 to S-177.)  Notably, the various ERISA

provisions in *ESM* were identical to those cited by Assured here.  (*See, e.g.*, MARM 2006-OA2

Pro-Supp & Prospectus [Dkt. No. 33-2] at S-135 to S-137.)  As a consequence, the *ESM* court

was right to presume that only the 83-1 Exemption applied to the ERISA-eligible certificates.

The Court should presume no differently here.

In any case, the ultimate source of the ERISA exemption is irrelevant to what the contract

actually provides:  priority of the Super Senior Certificates over the Senior Support Certificates

in respect of principal losses and recoveries.  (*See* PSA [Ex. 2] §§ 4.02(c)(3), 4.02(e), 4.02(f),

4.03(c)(3), 4.03(e), 4.03(f).)  Assured's improper reimbursements violate this basic structure.

### C.    The Transaction Unambiguously Limits Assured To Subrogation Only At Specified Waterfall Steps

Assured's limited subrogation right under the plain terms of the Trust documents is

further confirmed by the Trust's waterfall features.  Assured is paid concurrent with or

immediately following steps at which the corresponding group or subgroup of Insured

Certificates would otherwise be paid.  Assured's contention to the contrary (Opp. at 3; *cf. id*. at

23 n.11) is belied by the actual waterfall.  (*See generally* PSA [Ex. 2] §§ 4.02(a) - (c), 4.03(a) -

---

[13] In fact, Assured itself questioned in *ESM* whether the Underwriter's Exemption actually applied in considering identical ERISA provisions in the MARM 2006 Pro-Supp: "[E]ven if [the Super Senior Certificates] were not actually ERISA eligible (and even if the Prospectus Supplement did not sufficiently disclose risks to Certificates due to the payment waterfall), that would not affect the priority of payments under the PSA."  (*See* Assured Reply *ESM* [Ex. 7] at 16.)  On appeal, Assured changed tactics and claimed the Underwriter's Exemption did apply, as it does here.  (*See* Assured Appellate Br. *ESM* [Ex. 8] at 18-20.)  In spite of this, the Second Circuit affirmed the district court's decision after reviewing the record *de novo*.

(c).)[14]  Assured next argues that it is entitled to broader reimbursement *because* certain of its reimbursement rights fall on the succeeding steps.  (Opp. at 19-20.)  This argument also fails.  In MARM 2006-OA2, Assured's reimbursement steps also succeeded steps in which its subrogors, the insured certificates, were paid.  *See generally ESM*, 785 F. Supp. 2d at 199-202.  The *ESM* court found this to *support*, rather than diminish, the finding that Assured's reimbursement rights are limited to subrogation.  *See id.* at 196 ("Assured provides no other explanation as to why each payment to Assured should directly follow a payment to the Insured Certificates.").[15]

Assured also argues that Wales' interpretation would "deprive" Assured of its subrogation right at its express reimbursement steps because other Trust liabilities must be paid down in the prior steps.  (*See* Opp. at 20.)  But, to the extent other Trust liabilities *are* interfering with Assured's subrogation amounts (and Assured fails to allege facts that they actually are), this would be equally true in *ESM*, in which other Trust liabilities (for example, classes of non-insured senior certificates) were to be paid from the same income pool at steps prior to Assured's subrogation steps.  (*See, e.g.*, MARM 2006 OA2 PSA [Dkt. No. 33-1] §§ 4.02(a)(2)(A), 4.02(a)(5)(1)(a)(i).)  Such practice would also be consistent with Assured's limited subrogation right:  the PSA waterfall simply limits Assured's rights to subrogation to "the sources and in the

---

[14] Under the Interest Waterfall, Assured is entitled to a potential subrogation payment of "Interest Carry Forward Amounts" at the applicable Group level, as opposed to Subgroup level, of the Insured Certificates.  (*See* PSA [Ex. 2] §§ 4.02(a)(2)(B)(b), 4.03(a)(2)(B)(b)).)  By definition, this subrogation payment also captures any "Interest Carry Forward Amounts" that would have been paid to the Insured Certificates at the Subgroup level, earlier in the waterfall.  *See id.* § 1.01 (definition of "Group 1 Certificate Insurer Reimbursement Amount" is the *sum* of the applicable Subgroup Reimbursement Amounts).

[15] As in *ESM*, the Insured Certificates are paid to reduce Unpaid Realized Loss Amounts only to the extent "not covered by the policy."  (*See* PSA [Ex. 2] §§ 4.02(c)(3), 4.03(c)(3); *see also* MARM 2006-OA2 PSA [Dkt. No. 33-1] §§ 4.02(a)(8)(a)-(d).)  In other words, here the PSA simply makes clear that reimbursements of principal losses already covered by Assured do not go to the Insured Certificates at this step, but to Assured at the succeeding reimbursement step. *See ESM*, 785 F. Supp. 2d at 195.

manner provided herein." *ESM*, 785 F. Supp. 2d at 196-197 (citing PSA § 12.05); *see also*

*World Trade Ctr. Props. LLC v. Certain Underwriters at Lloyd's*, 906 F. Supp. 2d 295, 303 n.6

(S.D.N.Y. 2012) (express subrogation provisions trump equitable subrogation rights, even if

those provisions somehow limit such rights).

Finally, and independently, each of Assured's waterfall arguments is premised on a

theory that Assured is owed "phantom" subrogation payments at entirely separate steps in the

waterfalls.  (Opp. at 19-20.)  That theory is implausible on its face.  As an initial matter, Assured

has *never received* subrogation payments at steps other than where it is expressly entitled to a

"Certificate Insurer Reimbursement Amount."  *See* Am. Compl. ¶ 16 (noting that the Trust

Administrator has been reimbursing Assured for "any amounts previously paid by Assured for

claims in respect of the Insured Certificates" at the "Certificate Insurer Reimbursement Amount"

waterfall step, and after payment of Interest Funds to the Senior Certificates earlier in the

waterfall).  This is not surprising, because *nothing in the governing documents provides for any*

*such additional payment.  See ESM*, 785 F. Supp. 2d at 197 (finding it implausible "that the

drafters would fail to expressly provide for [separate] subrogation payment in the waterfall"); *see*

*also Millgard Corp. v. E.E. Cruz/NAB/Fronier-Kemper*, No. 99 Civ. 2952(LBS), 2003 WL

22741664, at *4 (S.D.N.Y. Nov. 18, 2003) ("Since an omission of a term does not itself create an

ambiguity, the contract must be understood in light of the terms actually expressed within it.").

In fact, under Assured's theory, if separate subrogation payments were read into separate

waterfall steps, Assured would receive an improper windfall, because those payments could be

duplicative of general reimbursement payments already made to Assured on previous

Distribution Dates.  *See Simas v. Merrill Corp.*, No. 02 Civ. 4400(RCC), 2004 WL 213013, at *4

(S.D.N.Y. Jan. 29, 2004) (contract interpretations leading to absurd results or windfalls must be

rejected).

In the end, the Trust's integrated priority of payments structure, *see* Assured CCs [Dkt. No. 27] ¶ 13, provides reimbursement to Assured only at the various waterfall steps providing for a "Certificate Insurer Reimbursement Amount," defined as "amount[s] owing [to Assured]" for reimbursement "under the Certificate Insurance Policy." (*See supra* at 2-3.)

### D.    A General Reimbursement Right Would Turn The Entire Concept Of "Insurance" On Its Head

Finally, Assured's limited subrogation right is both consistent with principles of insurance and commercially reasonable.  By contrast, Assured's interpretation violates fundamental principles of insurance, because Assured's insurance liabilities are being substantially offset by tens of millions of dollars of credits from available Trust funds that would otherwise pay additional principal amounts to the Senior Certificateholders (including Assured's own insureds) under the Excess Funds Waterfall.  This is a paradigmatic violation of the anti-subrogation rule.  (*See* Br. at 21-22.)  Assured argues that the anti-subrogation rule has no application here because it has an express right to reimbursement from general monies flowing to its own insureds (Opp. at 28-29), but it cites no legal support for such proposition and, in any case, its position is built on a faulty premise.  The scope of Assured's supposed reimbursement rights is the ***very issue*** to be determined.  And, even if "strict antisubrogation does not apply," anti-subrogation "is precisely the sort of insurance law principle that should inform [the claims at issue] because [the] court is not supposed to ignore the insurer/insured nature of the relationship between the parties."  *Assured Guar. Mun. Corp. v. DLJ Mortg. Capital, Inc.*, No. 652837/2011, 2014 WL 3288335, at *9 (Sup. Ct. N.Y. Cnty. July 3, 2014) (construing contracts as limiting Assured's rights to recover losses).

Separately, Assured's claim to broad reimbursement is also commercially unreasonable.

14

(*See* Br. at 21-22.)  Assured's purported "substantial amount of risk" (Opp. at 28) is belied by the fact that, under its interpretation, it is regularly recovering from collateral worth three times the amount it is supposedly insuring.  (*See* Br. at 22.)  Assured's claim that it is recovering only a small portion of its insurance payments (*see* Opp. at 28) is misleading.  To date, under its faulty interpretation, Assured would be entitled to nearly *$100 million* (and counting) in reimbursements from the Trust.  *See* Wales CCs [Dkt. No. 25] ¶ 108; Opp. at 28.  Finally, it is implausible that Assured would be entitled to a substantially similar premium amount in MARM 2007-3 as in the trust at issue in *ESM*, MARM 2006-OA2, but that in MARM 2007-3 (unlike in MARM 2006-OA2) it is somehow entitled unfettered reimbursements from available Trust assets.  (*Compare* Pro-Supp [Ex. 3] at S-105 (providing for an annual premium of 0.060% of the principal balance of Insured Certificates) *with* MARM 2006-OA2 Pro-Supp [Dkt. No. 33-2] at S-89 (providing for an annual premium of 0.0650% of the principal balance of the Insured Certificates).)

## CONCLUSION

For the foregoing reasons, Wales respectfully submits that its motion for judgment on the pleadings pursuant to Rule 12(c) should be granted.

Dated:  November 17, 2014
      New York, New York

/s/ *Jayant W. Tambe*
Jayant W. Tambe (JT-0118)
Kelly A. Carrero (KC-5218)
Alex P. McBride (AM-1979)
JONES DAY
222 East 41st Street
New York, New York 10017
Telephone: (212) 326-3939
Facsimile: (212) 755-7306

*Attorneys for Interpleader Defendant Wales LLC*

15

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

WELLS FARGO BANK, N.A., solely in its
capacity as Trust Administrator of MASTR
Adjustable Rate Mortgages Trust 2007-3,

                    Interpleader Plaintiff,

      v.

WALES LLC, ASSURED GUARANTY
MUNICIPAL CORP. (f/k/a FINANCIAL
SECURITY ASSURANCE INC.), THE
DEPOSITORY TRUST COMPANY, CEDE &
CO., as registered Holder of certain Certificates and
nominee name of the Depository Trust Company,
and DOES 1 through 100, beneficial owners of
certain Certificates,

                    Interpleader Defendants.

Case No. 13 Civ. 06781(PGG) (HP)

---

## CERTIFICATE OF SERVICE

        I certify that on November 17, 2014, I caused the foregoing Reply Memorandum of Law

in Further Support of Wales LLC's Motion for Judgment on the Pleadings Pursuant to Rule 12(c)

to be electronically filed with the Clerk of Court using the CM/ECF system.

Dated: November 17, 2014
New York, New York

                                      */s/ Jayant W. Tambe*
                                      Jayant W. Tambe (JT-0118)
                                      JONES DAY
                                      222 East 41st Street
                                      New York, New York 10017
                                      Telephone: (212) 326-3939
                                      Facsimile: (212) 755-7306