UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WELLS FARGO BANK, N.A., solely in its
capacity as Trust Administrator of MASTR
Adjustable Rate Mortgages Trust 2007-3,

Interpleader Plaintiff,

-against-

WALES LLC; ASSURED GUARANTY
MUNICIPAL CORP. (f/k/a FINANCIAL
SECURITY ASSURANCE INC.); THE
DEPOSITORY TRUST COMPANY; CEDE
& CO., as registered Holder of certain
Certificates and nominee name of the
Depository Trust Company; DOES 1
THROUGH 100, beneficial owners of certain
Certificates,

Interpleader Defendants.

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: _9/30/16_ |

**MEMORANDUM
OPINION & ORDER**

13 Civ. 6781 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

On September 25, 2013, Wells Fargo Bank, N.A., filed the Interpleader

Complaint in this action in its capacity as Trust Administrator of the MASTR Adjustable Rate

Mortgages Trust 2007-3 ("MARM 2007-3" or the "Trust"), a residential mortgage-backed

securitization that was effective as of April 1, 2007. (Interpleader Cmplt. (Dkt. No. 1)) An

Amended Interpleader Complaint was filed on October 25, 2013. (Am. Interpleader Cmplt.

("Am. Cmplt.") (Dkt. No. 15)) Wells Fargo seeks an adjudication of the respective rights of the

Interpleader Defendants – Wales LLC, Assured Guaranty Municipal Corp. ("Assured"), The

Depository Trust Company, Cede & Co., and Does 1 through 100 (unknown beneficial owners

of certain certificates issued by the Trust) – to certain Trust proceeds. Interpleader Defendants

Wales and Assured have asserted cross-claims against one another asserting rights to those proceeds. (Dkt. Nos. 25, 27)

The dispute between Wales and Assured arises out of competing interpretations of the priority-of-payment provisions (the "waterfall provisions") of the Trust's Pooling and Servicing Agreement (the "PSA") – the instrument that governs the Trust's issuance of certificates that entitle various classes of certificate holders to distributions of the Trust's proceeds. (Am. Cmplt. (Dkt. No. 15) ¶¶ 10-13, 17-34) At issue is whether, under the waterfall provisions, Assured – the financial guaranty insurer for certain classes of certificates issued by the Trust – has an independent right to reimbursement from the trust proceeds for previously-paid insurance claims, or whether it is only entitled to subrogation of the rights of the certificate holders whose certificates it insures. (Id. ¶¶ 14, 16-33) Prior to August 21, 2013, Wells Fargo distributed trust proceeds to Assured in a manner consistent with the first interpretation. (Id. ¶ 16) On August 21, 2013, however, representatives of certain certificate holders – including Wales – objected to these distributions to Assured, arguing that the latter interpretation should control. (Id. ¶ 17-18) Wells Fargo subsequently placed contested distribution amounts into escrow pending the resolution of this interpleader action. (Id. ¶¶ 35-37)

Wales has moved for judgment on the pleadings (Dkt. No. 59), asking this Court to (1) dismiss Assured's cross-claims; (2) declare that Assured's rights to the MARM 2007-3 proceeds are limited to subrogation as to the certificates for which it has paid insurance claims; (3) order the return to MARM 2007-3 of certain amounts previously distributed to Assured; and (4) order the distribution of amounts currently held in escrow pursuant to an interpretation of the

2

governing documents that limits Assured's payment rights to subrogation. (Wales Br. (Dkt. No. 60) at 6[1])

For the reasons explained below, Wales's motion for judgment on the pleadings will be denied.

## BACKGROUND

### I. FACTS[2]

#### A. Formation of MARM 2007-3 and Assured's Role as Certificate Insurer

In April 2007, the MARM 2007-3 Trust issued certificates that entitled their holders to distributions of interest and principal payments received from the mortgage loans held by the Trust. (Am. Cmplt. (Dkt. No. 15) ¶ 10) These loans are divided into two groups – Group 1 Loans and Group 2 Loans. These two groups are, in turn, divided into subgroups – Subgroup 1-1 and 1-2 Loans, and Subgroup 2-1 and 2-2 Loans. (Id.) Each Group and Subgroup of loans corresponds to a Group and Subgroup of certificates. Distributions to the certificate holders are paid on each month's distribution date out of funds derived from, inter alia, interest payments on the mortgage loans held by the Trust ("Interest Funds") and principal payments on the mortgage

---

[1] All page citations are as reflected on this District's Electronic Case Filing system.

[2] The Court's factual statement is drawn from the Amended Interpleader Complaint, Wales's and Assured's cross-claims, and documents attached to and incorporated by reference in those pleadings. See Galtieri v. New York City Police Pension Fund, No. 12 Civ. 1159 (PGG), 2014 WL 4593927, at *8 (S.D.N.Y. Sept. 15, 2014) ("In deciding a Rule 12(c) motion, courts must apply the same standard applicable to a motion to dismiss under Rule 12(b)(6)." (citing Bank of N.Y. v. First Millenium, Inc., 607 F.3d 905, 922 (2d Cir. 2010))); Kassner v. 2nd Ave. Delicatessen, Inc., 496 F.3d 229, 237 (2d Cir. 2007). "In assessing the legal sufficiency of [a plaintiff's] claim[s] [on a motion to dismiss,]" the court may "consider . . . the complaint and any documents attached thereto or incorporated by reference and 'documents upon which the complaint "relies heavily."'" Bldg. Indus. Elec. Contractors Ass'n v. City of New York, 678 F.3d 184, 187 (2d Cir. 2012) (quoting In re Citigroup ERISA Litig., 662 F.3d 128, 135 (2d Cir. 2011) (quoting DiFolco v. MSNBC Cable L.L.C., 622 F.3d 104, 111 (2d Cir. 2010))).

loans held by the Trust ("Principal Funds"). (Id. ¶ 11) Distributions are made in the amount and according to the priority set forth in the PSA's payment waterfalls. (Id. ¶¶ 12-13)

The Trust contains multiple classes of certificates with different levels of risk. The two classes of certificates relevant here are designated in the transaction's Prospectus Supplement ("Prosp. Supp.") as Super Senior and Senior Support Certificates. (Tambe Decl. (Dkt. No. 61) Ex. 3, Prosp. Supp. at 9). The PSA is generally written to ensure that the holders of Super Senior Certificates are the most likely of all certificate holders to receive their scheduled distributions. For example, the Trust allocates losses it sustains – for example, when borrowers default on their mortgages – first to the mezzanine and Senior Support Certificates and last to the Super Senior Certificates. (See Tambe Decl. (Dkt. No. 61) Ex. 2, MARM 2007-3 Pooling and Servicing Agreement ("PSA") §§ 4.02(e), 4.03(e)) This "[s]ubordination is intended to enhance the likelihood of regular distributions on the more senior certificates." (Prosp. Supp. at 22) In other portions of the waterfall provisions, however – including as to distributions of interest funds – Super Senior and the Senior Support Certificates are accorded equal priority of distribution. (See, e.g., PSA § 4.02(a))

Wales is a holder of a Super Senior Certificate. (Am. Cmplt. (Dkt. No. 15) ¶ 17)

## B. Assured's Repayment Rights: The Payment Waterfalls, the Certificate Insurer Reimbursement Amount, and Assured's Right of Subrogation

On May 15, 2007, Assured issued an insurance policy guaranteeing scheduled payments of interest and principal to the Senior Support Certificates – the Class 1-1A2, 1-2A2, 2-1A2, 2-2A3,[3] and 2-2A6 Certificates (the "Insured Certificates"). (Tambe Decl. (Dkt. No. 61)

---

[3] Class 2-2A3 Certificates – unlike the other Insured Certificates – are not Senior Support Certificates. Rather, Class 2-2A3 Certificates are Super Senior Certificates. (See Prosp. Supp. at 9)

4

Ex. 4, Financial Guarantee Insurance Policy ("Insurance Policy") ¶ 1; Assured Cross-Claim (Dkt. No. 27) ¶ 2; Am. Cmplt. (Dkt. No. 15) ¶ 14)  Assured, as the Trust's Certificate Insurer, is entitled to repayment from the Trust – in accordance with the terms of the PSA – of any claims it pays out to holders of Insured Certificates.  (Am. Cmplt. (Dkt. No. 15) ¶ 15)

The dispute between the parties concerns the type and extent of Assured's repayment rights.  The issue presented is whether the PSA provides Assured with an independent right to reimbursement from the Trust proceeds for the insurance claims it pays, or whether Assured is only entitled to subrogation of the rights of holders of Insured Certificates for which it pays claims.  (Id. ¶¶ 14, 16-33)  As the Trust's Certificate Insurer, Assured's repayment rights are defined primarily in the PSA provisions detailing the structure of the payment waterfalls.  These provisions provide for payments to Assured at various points in the distribution process.  At these stages in the distribution process, Assured is entitled to the "Certificate Insurer Reimbursement Amount" as to a given Group and Subgroup of certificates.  (See PSA §§ 4.02, 4.03, 1.01)  The PSA also contains provisions setting forth Assured's rights of subrogation.  (See PSA § 12.05)

Sections 4.02 and 4.03 of the PSA establish the payment waterfalls for Loan Groups 1 and 2, respectively.  (PSA §§ 4.02, 4.03).  The Group 1 and Group 2 waterfall provisions provide for an Interest Funds waterfall (PSA §§ 4.02(a), 4.03(a)), a Principal Funds waterfall (PSA §§ 4.02(b), 4.03(b)), and a Net Monthly Excess Cashflow waterfall.  (PSA §§ 4.02(c), 4.03(c))  The waterfall provisions set forth in Section 4.02 for Group 1 are structurally identical to those set forth in Section 4.03 for Group 2.

For any given set of Insured Certificates, the PSA defines the Certificate Insurer Reimbursement Amount as

any amount owing to the Certificate Insurer . . . for reimbursement, with interest, for claims paid with respect to the [given Class of Insured Certificates] under the Certificate Insurance Policy and any amounts with respect to the [given Class of Insured Certificates] owing to the Certificate Insurer and remaining unpaid for such Distribution Date.

PSA § 1.01.[4]

The various payment waterfalls are structured as follows:

The Interest Funds waterfall for Loan Group 1 distributes Interest Funds for Loan

Group 1 to

the Group 1 Certificates and to the Certificate Insurer in the following order and priority and, in each case, to the extent of such Interest Funds for Loan Group 1:

(1) first, concurrently, as follows:

(A) from the Interest Funds for Loan Subgroup 1-1, sequentially, as follows:

(a) first, to the Class 1-AIO [Interest Only] Certificates . . . ; and

(b) second, concurrently, pro rata, as follows:

(i) to each Class of Subgroup 1-1 Certificates, pro rata, up to the [total amount of interest due on the given distribution date]; and

(ii) to the Certificate Insurer, up to the Subgroup 1-1 Premium Distribution Amount, if any, for such Distribution Date;

(B) from the Interest Funds for Loan Subgroup 1-2, sequentially, as follows:

(a) first, to the Class 1-AIO [Interest Only] Certificates . . . ; and

(b) second, concurrently, pro rata, as follows:

(i) to each Class of Subgroup 1-2 Certificates, pro rata, up to the [total amount of interest due on the given distribution date]; and

---

[4] At certain points in the distribution process, Assured is also entitled to Premium Distribution Amounts. These amounts refer to premium payments owed to Assured under the Certificate Insurance Policy. See PSA § 1.01. The Premium Distribution Amounts do not implicate Assured's reimbursement rights and are not in dispute here.

6

                (ii) to the Certificate Insurer, up to the Subgroup 1-2 Premium
                     Distribution Amount, if any, for such Distribution Date;

(2) second, from the remaining Interest Funds for Loan Group 1, sequentially, as
    follows:

    (A) first, to the Class 1-AIO [Interest Only] Certificates . . . ; and

    (B) second, concurrently, pro rata, as follows:

        (a) to each Class of Subgroup 1-1 Certificates and Subgroup 1-2
            Certificates, pro rata, up to the [total amount of interest due on the
            given distribution date]; and

        (b) to the Certificate Insurer, up to the sum of the Group 1 Premium
            Distribution Amount and the Group 1 Certificate Insurer
            Reimbursement Amount, if any, for such Distribution Date, to the
            extent remaining unpaid. . . .

(3) third, from the remaining Interest Funds for Loan Group 1, sequentially, to
    [certain mezzanine Certificates] up to the Current Interest [due on the given
    distribution date]

(PSA § 4.02(a) (emphasis added))

        The Principal Funds waterfall for Loan Group 1 distributes the Principal Funds

for Loan Group 1 to[5]

    the Group 1 Certificates and to the Certificate Insurer in the following order and
    priority and, in each case, to the extent of the Principal Funds for Loan Group 1:

    (A) on each Distribution Date . . . in the following order of priority, in an amount
        up to the Group 1 Principal Distribution Amount

        (1) first, concurrently, to the following Classes of Certificates, pro rata on the
            basis of the related Subgroup Principal Distribution Amount:

            (a) in an amount up to the Subgroup 1-1 Principal Distribution Amount
                for such Distribution Date, sequentially:

---

[5] The amount of the distributions within the Principal Funds waterfall will differ depending on
whether certain "Trigger Events" or "Stepdown Dates" have occurred. See PSA §§ 4.02(b)(A),
(B). As relevant to the issues in this case, however, the structure of the Principal Funds waterfall
is identical. Accordingly, this Court has set out only the waterfall under PSA § 4.02(b)(A).

      (i)   first, concurrently, to the Subgroup 1-1 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero;

      (ii)  <u>second, to the Certificate Insurer, up to the Subgroup 1-1 Certificate Insurer Reimbursement Amount, if any, to the extent remaining unpaid for such Distribution Date</u>; and

      (iii) third, concurrently, to the Subgroup 1-2 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the Subgroup 1-2 Principal Distribution Amount) until their respective Class Principal Balances are reduced to zero; and

  (b) in an amount up to the Subgroup 1-2 Principal Distribution Amount for such Distribution Date, sequentially:

      (i)   first, concurrently, to the Subgroup 1-2 Certificates, pro rata based on Class Principal Balance, until their respective Class Principal Balances are reduced to zero;

      (ii)  <u>second, to the Certificate Insurer, up to the Subgroup 1-2 Certificate Insurer Reimbursement Amount, if any, to the extent remaining unpaid for such Distribution Date</u>; and

      (iii) third, concurrently, to the Subgroup 1-1 Certificates, pro rata based on Class Principal Balance (after any payments to such Certificates from the Subgroup 1-1 Principal Distribution Amount) until their respective Class Principal Balances are reduced to zero;

  (2) second, to the Certificate Insurer up to the Group 1 Certificate Insurer Reimbursement Amount, if any, to the extent remaining unpaid for such Distribution Date; and

  (3) third, sequentially to [certain mezzanine Certificates] until their respective Class Principal Balances are reduced to zero . . . .

(PSA § 4.02(b) (emphasis added))

        "[F]ollowing any distributions pursuant to Sections 4.02(a) and 4.02(b),"

remaining funds are distributed pursuant to the Net Monthly Excess Cashflow waterfall. (PSA §

4.02(c))  Within this waterfall, funds are distributed first to certain classes of Group 1

Certificates for over-collateralization.[6] (PSA § 4.02(c)(1)) Second, certain mezzanine

certificates receive interest payments. (PSA § 4.02(c)(2)) The Net Monthly Excess Cashflow is

then paid

> third, concurrently, to the Group 1 Senior Certificates (other than the Class 1-AIO
> [Interest Only] Certificates), pro rata based on the aggregate Unpaid Realized
> Loss Amounts[7] with respect to the Subgroup 1-1 or Subgroup 1-2 Certificates, as
> applicable:
>
> > (a) with respect to the Subgroup 1-1 Certificates, sequentially, (i) first to the
> > Class 1-1A1 Certificates, in an amount up to the Unpaid Realized Loss
> > Amount for such Class of Certificates, (ii) second, to the Class 1-1A2
> > Certificates in an amount up to the Unpaid Realized Loss Amount for such
> > Class of Certificates to the extent not covered by the Certificate Insurance
> > Policy, and (iii) third, to the Certificate Insurer, in an amount up to the
> > Subgroup 1-1 Certificate Insurer Reimbursement Amount, if any, to the
> > extent remaining unpaid for such Distribution Date;
> >
> > (b) with respect to the Subgroup 1-2 Certificates, sequentially, (i) first, to the
> > Class 1-2A1 Certificates, in an amount up to the Unpaid Realized Loss
> > Amount for such Class of Certificates, (ii) second, to the Class 1-2A2
> > Certificates in an amount up to the Unpaid Realized Loss Amount for such
> > Class of Certificates to the extent not covered by the Certificate Insurance
> > Policy, and (iii) third, to the Certificate Insurer, in an amount up to the
> > Subgroup 1-2 Certificate Insurer Reimbursement Amount, if any, to the
> > extent remaining unpaid for such Distribution Date . . . .

(PSA § 4.02(c)(3) (emphasis added)) Any remaining Net Monthly Excess Cashflow funds are

distributed to the holders of various other certificates.

        In addition to the payment waterfalls providing for distributions to Assured, the

PSA addresses – in Section 12.05 – Assured's rights of subrogation:

---

[6] The MARM 2007-3 Trust holds assets designed to generate cash flows beyond those necessary
to make all of the Trust's scheduled distributions. These excess assets are known as "over-
collateralization." Certain classes of certificates are entitled to over-collateralization payments
designed, in effect, to provide a buffer to ensure that these certificate holders receive the full
payment of principal and interest to which they would be entitled. (See Prosp. Supp. at 21-22)
[7] The Unpaid Realized Loss Amount for a given class of certificates is the amount of loss
suffered by the Trust that has previously been applied to that class minus any subsequent
recoveries that have since increased the principal balance of that class. (See PSA § 1.01)

[E]ach Holder of an Insured Certificate by its acceptance of [such a] Certificate agrees, that without the need for any further action on the part of the Certificate Insurer [or the administrators of the Trust] (i) to the extent the Certificate Insurer makes payments, directly or indirectly, on account of principal or interest on any Insured Certificate to the Holder of such Certificate, the Certificate Insurer will be fully subrogated to the rights of such Holder to receive such principal and interest from the Trust Fund and (ii) the Certificate Insurer shall be paid such principal and interest but only from the sources and in the manner provided herein for the payment of such principal and interest.

(PSA § 12.05)

## C.   Related Transaction Documents

In determining whether the PSA provides Assured with an independent reimbursement right, or only with a right of subrogation, this Court has also considered the Prospectus Supplement for the MARM 2007-3 transaction. The Prospectus Supplement was provided to potential investors in the transaction and sets forth, inter alia, the PSA's payment waterfalls and related definitions. The Prospectus Supplement contains information concerning the extent of – and the limits to – credit enhancements in the PSA designed to ensure that holders of Super Senior Certificates, such as Wales, receive scheduled distributions. (See, e.g., Prosp. Supp. at 22-23)

This Court has also considered a May 15, 2007 Commitment Letter entered into by Assured, UBS Real Estate Securities, Inc. – the Transferor, or seller, of the mortgage loans held by the Trust (see PSA § 1.01) – and Mortgage Asset Securitization Transactions, Inc. – the depositor of the mortgage loans held by the Trust (see id.). The Commitment Letter describes the terms under which Assured will insure the certificates that are part of the MARM 2007-3 transaction. (Assured Answer (Dkt. No. 27), Ex. 1 ("Commitment Letter"))

The Commitment Letter provides that Assured

will be entitled to be subrogated to the rights of the holders of the Insured Certificates with respect to the amounts for which [Assured] has made a payment

10

under the Policy and shall be entitled to the assignment of the holders' rights in conjunction with such payment. [Assured] shall be entitled to reimbursement pursuant to the priority of payment set forth in the Final Prospectus Supplement.

(Id. ¶ 2)

The Commitment Letter also provides that

[t]he Pooling and Servicing Agreement [("PSA")] to be dated as of April 1, 2007 . . . pursuant to which the Insured Certificates are issued will contain provisions . . . (vii) providing for the subrogation of [Assured] to the rights of the holders of the Insured Certificates for payments made by [Assured] on the Policy and the assignment to [Assured] of the holders' rights in conjunction with such payment, . . . [and] (ix) providing for the reimbursement of payments made to the policy by [Assured] . . . . It shall be a condition to the issuance of the Policy that the provisions of the [PSA] relating to the above matters shall be satisfactory to [Assured].

(Id. ¶ 4)[8]

## D.   Wells Fargo's Distribution of Reimbursement
## Payments to Assured and the Current Dispute

Prior to August 21, 2013, Wells Fargo distributed Trust proceeds to Assured

according to an interpretation of the PSA that granted Assured both subrogation and a separate

reimbursement right. (Id. ¶ 16) Accordingly, Wells Fargo distributed Interest Funds to Assured

at the distribution steps in the Interest Funds waterfalls for Loan Groups 1 and 2 described in

---

[8]  Wales argues that the Commitment Letter constitutes parol evidence. (Wales Reply Br. (Dkt. No. 63) at 3-4)  While it is true that only certain parties to the MARM 2007-3 transaction executed the Commitment Letter, it was "a condition of the issuance of the Policy that the" terms of the PSA reflected the terms of the Commitment Letter. (Commitment Letter ¶ 4)  Accordingly, the Commitment Letter played a crucial role in the MARM 2007-3 transaction. As discussed below, "[u]nder New York law, 'all writings which form part of a single transaction and are designed to effectuate the same purpose must be read together, even though they were executed on different dates and were not all between the same parties.'" TVT Records v. Island Def Jam Music Group, 412 F.3d 82, 89 (2d Cir. 2005) (quoting This is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998)).  The Commitment Letter is a writing designed to effectuate those provisions of the PSA governing the insuring of payments of interest and principal to the Trust's certificate holders and, accordingly, may be considered by this Court in resolving the instant motion.

PSA Sections 4.02(a)(2)(B)(b) and 4.03(a)(2)(B)(b) for reimbursement of claims Assured had paid on the Insured Certificates as to both interest and principal. (Id.)

On August 21, 2013, Wales and certain other certificate holders objected to these distributions made to Assured. (Id. ¶ 17) They argued that the PSA should be interpreted to limit Assured's rights to subrogation and that, accordingly, any distributions to Assured beyond its subrogation rights – i.e., reimbursement out of the Interest Funds beyond what the subrogated certificates would have been entitled to – violated the PSA. (Id. ¶¶ 18-19)

Wells Fargo then initiated this interpleader action and has placed all subsequent contested distribution amounts into escrow pending the resolution of this proceeding. (Id. ¶¶ 35-37)

## II.    PROCEDURAL BACKGROUND

On September 25, 2013, Wells Fargo Bank, N.A., filed the Interpleader Complaint in this action in its capacity as Trust Administrator of the MARM 2007-3 trust. (Cmplt. (Dkt. No. 1)) An Amended Interpleader Complaint was filed on October 25, 2013. (Am. Cmplt. (Dkt. No. 15)) On November 20, 2013, Wales filed an Answer to the Amended Interpleader Complaint, along with cross-claims against Assured, seeking, inter alia, (1) a declaratory judgment that its interpretation of the PSA is correct, (2) an order requiring Assured to return certain amounts previously distributed to it by Wells Fargo, and (3) an order requiring Wells Fargo to distribute the amounts it has placed in escrow pending resolution of this action pursuant to its interpretation of the PSA. (Dkt. No. 25) On November 21, 2013, Assured filed an Answer to the Amended Interpleader Complaint, along with cross-claims against Wales, seeking a declaratory judgment that the PSA grants it a separate right of reimbursement in addition to its subrogation rights. (Dkt. No. 27)

12

On November 17, 2014, Wales moved for judgment on the pleadings. (Dkt.

No. 59)  Wales asks this Court to (1) dismiss Assured's cross-claims; (2) declare that Assured's

rights to the MARM 2007-3 proceeds are limited to subrogation as to the certificates for which it

has paid insurance claims; (3) order the return to MARM 2007-3 of certain amounts previously

distributed to Assured; and (4) order the distribution of amounts currently held in escrow

pursuant to an interpretation of the governing documents that limits Assured's rights to

subrogation. (Wales Br. (Dkt. No. 60) at 6)

## DISCUSSION

## I.     LEGAL STANDARDS

### A.     Legal Standard for Rule 12(c) Motion

In deciding a Rule 12(c) motion for judgment on the pleadings, courts apply the

same standard applicable to a motion to dismiss under Rule 12(b)(6).  Bank of N .Y. v. First

Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010) (citing Sheppard v. Beerman, 18 F.3d 147,

150 (2d Cir. 1994)).  The court must "accept as true all facts alleged in the complaint," Kassner

v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N.

Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all

reasonable inferences in favor of the [non-moving party]."  Id. (citing Fernandez v. Chertoff, 471

F.3d 45, 51 (2d Cir. 2006)).

"On a [Rule] 12(c) motion, the court considers 'the complaint, the answer[s], any

written documents attached to them, and any matter of which the court can take judicial notice

for the factual background of the case.'"  L-7 Designs, Inc. v. Old Navy, LLC, 647 F.3d 419, 422

(2d Cir. 2011) (quoting Roberts v. Babkiewicz, 582 F.3d 418, 419 (2d Cir. 2009)).  "In deciding

the motion, the Court can consider documents referenced in the complaint and documents that

13

are in the plaintiff['s] possession or that the plaintiff[] knew of and relied on in bringing suit."
Cowan v. Ernest Codelia, P.C., No. 98 Civ. 5548(JGK), 2001 WL 856606, at *1 (S.D.N.Y. July
30, 2011). Moreover, "[a] complaint is deemed to include any written instrument attached to it
as an exhibit, materials incorporated in it by reference, and documents that, although not
incorporated by reference, are 'integral' to the complaint." Sira v. Morton, 380 F.3d 57, 67 (2d
Cir. 2004) (citations omitted). "The Court may also properly consider documents or information
contained in defendant's motion papers if the plaintiff has knowledge or possession of the
material and relied on it in drafting the complaint." Korova Milk Bar of White Plains, Inc. v.
PRE Properties, LLC, No. 11 Civ. 3327(ER), 2013 WL 417406, at *6 (S.D.N.Y. Feb. 4, 2013)
(citing Hoy v. Incorporated Village of Bayville, 765 F. Supp. 2d 158, 163 (E.D.N.Y. 2011)).
Finally, "[t]he court may also take judicial notice of matters of public record, such as pleadings
and court orders from prior litigation between the parties." Reisner v. Stoller, 51 F. Supp. 2d
430, 440 (S.D.N.Y. 1999) (citations omitted).

## B.    Contract Interpretation Under New York Law[9]

Whether a contract is ambiguous or unambiguous is a question of law properly
decided by the Court on a Rule 12(c) motion. Law Debenture Trust Co. v. Maverick Tube Corp.,
595 F.3d 458, 465 (2d Cir. 2010). "Under New York law, the initial interpretation of a contract
'is a matter of law for the court to decide.'" K. Bell & Assocs. v. Lloyd's Underwriters, 97 F.3d
632, 637 (2d Cir. 1996) (quoting Readco, Inc. v. Marine Midland Bank, 81 F.3d 295, 299 (2d
Cir. 1996)); see also Terwilliger v. Terwilliger, 206 F.3d 240, 245 (2d Cir. 2000) ("Construing
an unambiguous contract provision is a function of the court, rather than a jury, and matters
extrinsic to the agreement may not be considered when the intent of the parties can fairly be

---

[9] The PSA provides that it is governed by New York law. (See PSA § 11.03)

14

gleaned from the face of the instrument.") (citing Teitelbaum Holdings, Ltd. v. Gold, 48 N.Y.2d

51, 56 (1979)).

          "'[A] written contract is to be interpreted so as to give effect to the intention of

the parties as expressed in the unequivocal language they have employed.'" Rockland

Exposition, Inc. v. Alliance of Auto. Serv. Providers of N.J., 08 Civ. 7069 (KMK), 08 Civ.

11107 (KMK), 2009 WL 1154094, at \*5 (S.D.N.Y. Mar. 19, 2009) (quoting Terwilliger, 206

F.3d at 245). Accordingly, where a "'contract is clear and unambiguous on its face, the intent of

the parties must be gleaned from within the four corners of the instrument, and not from extrinsic

evidence.'" RJE Corp. v. Northville Indus. Corp., 329 F.3d 310, 314 (2d Cir. 2003) (quoting De

Luca v. De Luca, 300 A.D.2d 342 (2d Dept. 2002)).

          Moreover, "[u]nder New York law, all writings forming part of a single

transaction are to be read together." This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998)

(citing Gordon v. Vincent Youmans, Inc., 358 F.2d 261, 263 (2d Cir. 1965) ("[I]t is both good

sense and good law that these closely integrated and nearly contemporaneous documents be

construed together.")). All such writings must be considered together where they "are designed

to effectuate the same purpose . . . , even though they were executed on different dates and were

not all between the same parties." TVT Records, 412 F.3d at 89 (internal citations and quotation

marks omitted). Accordingly, in determining whether a contractual agreement is ambiguous or

unambiguous, a court must consider "all writings forming part of [the] transaction." This Is Me,

157 F.3d at 143.

          "'Contract language is not ambiguous if it has "a definite and precise meaning,

unattended by danger of misconception in the purport of the [contract] itself, and concerning

which there is no reasonable basis for a difference of opinion."'" Serdarevic v. Centex Homes,

LLC, 760 F. Supp. 2d 322, 329 (S.D.N.Y. 2010) (quoting Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274, 1277 (2d Cir.1989) (alteration in original) (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 355 (1978)).

"An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" RSL Commc'ns, PLC v. Bildirici, No. 04 Civ. 5217 (RJS), 2010 WL 846551, at *1 (S.D.N.Y. Mar. 5, 2010) (quoting Maverick Tube Corp., 595 F.3d at 466). However, a "court should not find the contract ambiguous where the interpretation urged by one party would 'strain [] the contract language beyond its reasonable and ordinary meaning.'" Maverick Tube Corp., 595 F.3d at 467 (quoting Bethlehem Steel Co. v. Turner Constr. Co., 2 N.Y.2d 456, 459 (1957)).

"Where there are alternative, reasonable constructions of a contract, i.e., the contract is ambiguous, the issue 'should be submitted to the trier of fact.'" K. Bell & Assocs., 97 F.3d at 637 (quoting Consarc Corp. v. Marine Midland Bank, N.A., 996 F.2d 568, 573 (2d Cir. 1993)).

## II.    THE GOVERNING DOCUMENTS DO NOT UNAMBIGUOUSLY LIMIT ASSURED'S REPAYMENT RIGHTS TO SUBROGATION

### A.    The Pooling and Servicing Agreement Suggests that Assured Has a Right to Both Reimbursement and Subrogation

The PSA defines the "Certificate Insurer Reimbursement Amount" as

any amount owing to the Certificate Insurer . . . for reimbursement, with interest, for claims paid with respect to the [given Class of Insured Certificates] under the Certificate Insurance Policy and any amounts with respect to the [given Class of Insured Certificates] owing to the Certificate Insurer and remaining unpaid for such Distribution Date.

16

(PSA § 1.01 (emphasis added)) This definition suggests that Assured is entitled to two different forms of repayment. First, Assured is entitled to "any amount owing to [it] . . . for reimbursement, with interest, for claims paid [in connection with the Insured Certificates]. . . ." Id. The definition of "Certificate Insurer Reimbursement Amount" then goes on to identify a second form of reimbursement to which Assured is also entitled: "any amounts with respect to the [given Class of Insured Certificates] owing to the Certificate Insurer and remaining unpaid for such Distribution Date." Id. The second part of the definition refers not to reimbursement with respect to claims paid, but rather to amounts "owing to [Assured]" with respect to the certificates themselves. Id. In sum, the definition of "Certificate Insurer Reimbursement Amount" refers to two distinct forms of repayment to which Assured is entitled: (1) reimbursement for claims paid, and (2) payment of amounts owed with respect to the certificates themselves.

Wales argues that this definition merely describes Assured's right of subrogation and the manner in which subrogation payments are to be made. (Wales Br. (Dkt. No. 60) at 11-12) Assuming arguendo that this is a plausible interpretation of the definition, it is not the only plausible interpretation. Wales ignores the fact that the plain language of the definition of "Certificate Insurer Reimbursement Amount" can reasonably be read to include two separate forms of repayment. Indeed, the second part of the definition appears to describe Assured's subrogation rights: the only way in which "amounts with respect to the [Certificates]" could be "ow[ed] to [Assured]" (PSA § 1.01) is through Assured's right of subrogation, because Assured does not independently hold any certificates. Accordingly, this portion of the definition must refer to Assured's right of subrogation.

17

Given that the second portion of the definition appears to refer to Assured's right of subrogation, it is reasonable to conclude that Assured's entitlement to "any amount owing to [it] . . . for reimbursement . . . for claims paid" must refer to Assured's right of reimbursement separate and apart from its right of subrogation. Any other reading would render half of the definition surplusage. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 405 (2d Cir. 2009) ("'a court should not adopt an interpretation which will operate to leave a provision of a contract without force and effect'" (quoting Corhill Corp. v. S.D. Plants, Inc., 9 N.Y.2d 595, 599 (1961))); Verzani v. Costco Wholesale Corp., 641 F. Supp. 2d 291, 299 (S.D.N.Y. 2009), aff'd, 387 F. App'x 50 (2d Cir. 2010) ("the court may not read [an] agreement to make any of its terms meaningless, or construe its language to render particular provisions 'mere surplusage'" (quoting FCI Group Inc. v. City of New York, 54 A.D.3d 171, 176 (1st Dept. 2008))); Del Glob. Techs. Corp. v. Park, No. 03 CIV. 8867 (PGG), 2008 WL 5329963, at *3 (S.D.N.Y. Dec. 15, 2008) ("It is a 'cardinal rule of contract interpretation that a court shall not interpret an agreement in a way which leaves a part meaningless or ineffectual.'" (quoting Hauser v. W. Group Nurseries, Inc., 767 F. Supp. 475, 488 (S.D.N.Y. 1991))).

The structure of the payment waterfalls supports this interpretation, because these provisions can reasonably be read to provide for both Assured's right of subrogation and a separate right of reimbursement. As with the definition of "Certificate Insurer Reimbursement Amount," Wales argues that where the PSA provides for payment to Assured, it simply sets forth expressly – in a "belt and suspenders" fashion – the points at which Assured is entitled to its subrogation payments. (See Wales Br. (Dkt. No. 60) at 20) Again, even assuming that this interpretation is reasonable, it is not the only reasonable interpretation of the PSA. Indeed,

Wales's reading of the PSA creates inconsistencies and redundancies in the PSA that it seems

doubtful the drafters would have intended.

        For example, the PSA provides for distributions to holders of the Insured

Certificates at certain points in the Interest Funds waterfall without a corresponding distribution

of the Certificate Insurer Reimbursement Amount to Assured.  (See PSA § 4.02(a))  This aspect

of the PSA suggests that the waterfall provisions cannot be read simply to mark the points at

which Assured receives its subrogation payments.[10]  If the points in the waterfall providing for

distributions to Assured were meant only to mark the steps at which Assured would receive

subrogation payments, one would expect Assured to receive a distribution at each point where

the holder of an Insured Certificate receives a distribution.  That is not the case within the

---

[10]  As discussed below, this feature distinguishes the payment waterfall provisions at issue here
from those discussed in Wells Fargo Bank, N.A. v. ESM Fund I, LP, 785 F. Supp. 2d 188
(S.D.N.Y. 2011).  In that case, the court considered a payment waterfall provision containing
different language, and concluded that the

> payment waterfall provide[d] for Assured to be paid at 17 different points, each
> immediately following a step in the waterfall that would have provided payment –
> either of interest or of principal – to the holders of Insured Certificates, had they
> not given up their right to it.  Assured's interpretation would render the 16 steps
> that follow [the first step at which it is entitled to payment] in the waterfall
> meaningless, as Assured would be fully reimbursed at [the first step].  Assured's
> suggestion that this is an intentional "belt and suspenders" approach is not
> convincing.  The Court has been unable to construct a scenario in which Assured
> would receive a payment through any of the 16 steps that follow [the first step].
> Furthermore, Assured provides no other explanation as to why each payment to
> Assured should directly follow a payment to the Insured Certificates.

ESM Fund, 785 F. Supp. 2d at 196.  Accordingly, the ESM Fund court found that the only
reasonable interpretation of the payment waterfall provision at issue was that wherever it
provided for distributions to Assured, it simply set forth the manner in which the subrogation
payments would be made.  Id. at 197.  Here, as discussed below, the language of the payment
waterfall provisions is different.  Payments to Assured do not at each step follow distributions to
holders of Insured Certificates, and reading the PSA to provide for separate rights of
reimbursement and subrogation would not render major portions of the waterfall provisions
redundant.

Interest Funds waterfall provision, however. In that waterfall provision, the holders of Class 1-AIO Interest Only Certificates receive a distribution sequentially between a distribution to the holders of the Insured Certificates and a distribution to Assured. (See PSA § 4.02(a)) If the Interest Funds waterfall provision was designed to simply mark the points at which Assured was entitled to subrogation payments, this provision should have provided for a distribution to Assured directly in conjunction with a distribution to the holders of Insured Class 1-1 and Class 1-2 Certificates. Instead, the payment to Assured occurs only after an intervening distribution to another class of certificate holders.

Where Interest Funds are exhausted between the steps at which the holders of Insured Certificates receive a distribution and the point at which Assured receives its subrogation payment, Assured would be subrogated to the rights of the Certificate Holder only to the extent of the remaining Interest Funds after the distributions to the intervening class of certificates. This result would be contrary to the PSA's subrogation provision, which states that Assured "will be fully subrogated to the rights of [the] Holder" of the Insured Certificate for which it has paid a claim. (PSA § 12.05) An interpretation of the PSA presenting such an inconsistency should be avoided. See Terwilliger, 206 F.3d at 245 ("the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency"); Reda v. Eastman Kodak Co., 233 A.D.2d 914, 915 (4th Dept. 1996) ("Effect and meaning must be given to every term of the contract, and reasonable effort must be made to harmonize all of its terms.").

One reasonable reading of the PSA is that where Assured is entitled to subrogation of the rights of an Insured Certificate holder, it should receive its distribution at the point in the waterfall where the Insured Certificate holder would otherwise receive the distribution. This interpretation gives effect to Section 12.05's mandate that

20

without the need for any further action on the part of the Certificate Insurer [or the administrators of the Trust] . . . to the extent the Certificate Insurer makes payments, directly or indirectly, on account of principal or interest on any Insured Certificate to the Holder of such Certificate, the Certificate Insurer will be fully subrogated to the rights of such Holder to receive such principal and interest. . . .

(PSA § 12.05)

Moreover, at the first point in the Interest Funds waterfall provision at which Assured's right to payment is expressly acknowledged, the PSA provides that Assured is entitled to receive its entire Group 1 Certificate Reimbursement Amount "to the extent remaining unpaid." (PSA § 4.02(a)(2)(B)(b) (emphasis added))  This language strongly suggests that Assured has an additional right of repayment at an earlier step in the waterfall. Here, because there is no earlier point in the Interest Funds waterfall providing expressly for payment of the Group 1 Certificate Insurer Reimbursement Amount, the reference to an earlier payment must be in connection with Assured's subrogation rights at the steps in the waterfall where the holders of Insured Certificates would already have received their distributions.

As discussed at the outset, the fact that the PSA alludes to multiple distributions of the Certificate Insurer Reimbursement Amount – defined as (1) reimbursement for claims paid and (2) amounts owing to Assured with respect to the Insured Certificates to the extent remaining unpaid (see PSA § 1.01) – indicates that Assured enjoys a separate right of reimbursement in addition to its right of subrogation. [11]

---

[11]  The Commitment Letter – which, as discussed above, is a predecessor document to the PSA – also indicates that Assured will have a right of reimbursement separate from its right of subrogation.  The Commitment Letter provides that Assured

will be entitled to be subrogated to the rights of the holders of the Insured Certificates with respect to the amounts for which [Assured] has made a payment under the Policy and shall be entitled to the assignment of the holders' rights in conjunction with such payment. [Assured] shall be entitled to reimbursement pursuant to the priority of payment set forth in the Final Prospectus Supplement.

21

Because one reasonable reading of the PSA is that Assured has an independent

right of reimbursement in addition to its right of subrogation, Wales's motion for judgment on

the pleadings will be denied.[12]

## B.   *Wells Fargo Bank v. ESM Fund* Is Not Applicable Here
       Because of Substantial Differences in the Trust Structure

Wales relies heavily on Wells Fargo Bank, N.A. v. ESM Fund I, LP, 785 F. Supp.

2d 188 (S.D.N.Y. 2011), which involves a residential mortgage backed securitization – the

MASTR Adjustable Mortgages Trust 2006-OA2 ("MARM 2006-OA2") – similar to the MARM

2007-3 Trust. Like the MARM 2007-3 Trust, the MARM 2006-OA2 Trust "operates by pooling

---

(Assured Answer (Dkt. No. 27), Ex. 1 ("Commitment Letter") ¶ 2)   The Commitment
Letter goes on to state that

> [t]he Pooling and Servicing Agreement [("PSA")] to be dated as of April 1, 2007 . . .
> pursuant to which the Insured Certificates are issued will contain provisions . . . (vii)
> providing for the subrogation of [Assured] to the rights of the holders of the Insured
> Certificates for payments made by [Assured] on the Policy and the assignment to
> [Assured] of the holders' rights in conjunction with such payment, . . . [and] (ix)
> providing for the reimbursement of payments made to the policy by [Assured] and the
> payment of [Assured]'s premium monthly [payments] . . . . It shall be a condition of
> the issuance of the Policy that the provisions of the [PSA] relating to the above
> matters shall be satisfactory to [Assured].

(Id. ¶ 4)

Accordingly, the Commitment Letter provides that the PSA "will contain provisions . . .
providing for . . . subrogation . . . [and] providing for the reimbursement of payments made to
the policy by [Assured]." (Id.)  And, as discussed above, it was "a condition [of] the issuance of
the [insurance] [p]olicy" that the PSA contain these provisions. (Id.)

[12]  Wales argues that because the Insurance Policy mentions only Assured's right of subrogation,
it would create an inconsistency within the governing documents to interpret the PSA as also
providing for an independent right of reimbursement. (See Wales Br. (Dkt. No. 60) at 21)  This
argument is misguided.  With respect to each individual Insured Certificate, Assured's
repayment right does not go beyond subrogation.  Any general reimbursement right enjoyed by
Assured is with respect to funds generated by the Trust as a whole, not funds directly owed any
individual holder of an Insured Certificate.

22

subprime mortgages and issuing certificates to investors who are entitled to eventual return of their principal and to interest payments paid using funds received by the Trust from borrowers on the mortgages." ESM Fund, 785 F. Supp. 2d at 191. As here, Wells Fargo served as the MARM 2006-OA2 Trust Administrator and was responsible for making distributions according to the "payment waterfall contained in the PSA. . . ." Id. at 192. Finally, also as here, Assured served as the insurer for certain certificates in the MARM 2006-OA2 transaction. Id. The issue in ESM Fund was the same as in the instant case: whether the payment waterfall provision in the MARM 2006-OA2 PSA provided Assured with a right of reimbursement separate from its right of subrogation.

   The ESM Fund court found that, under the terms of the MARM 2006-OA2 PSA waterfall provision, Assured's repayment rights were limited to subrogation. Id. at 196-97. Wales argues that the reasoning of ESM Fund applies with equal force here and that, accordingly, this Court should find that the MARM 2007-3 PSA waterfall provision provides Assured only with a right of subrogation. (Wales Br. (Dkt. No. 60) at 5). As discussed below, however, ESM Fund involved a significantly different payment waterfall provision than the one at issue here. Because of the substantive differences in the waterfall provisions, ESM Fund does not control this case.

   The MARM 2006-OA2 PSA contained a single waterfall provision, in which the interest and principal funds were pooled together as "Available Funds" and then distributed according to the waterfall's priority. See ESM Fund, 785 F. Supp. 2d at 199-205 (setting forth in an appendix the entire MARM 2006-OA2 PSA payment waterfall). "The payment waterfall provide[d] for Assured to be paid at 17 different points, each immediately following a step in the

waterfall that would have provided payment – either of interest or of principal – to the holders of Insured Certificates." Id. at 196.

Wales has provided the following chart to this Court, which visually depicts the MARM 2006-OA2 PSA payment waterfall:



**MARM 2006-OA2 Waterfall**

| Available Funds |
| --- |

| Interest Payments to Interest Only Certificates (PSA § 4.02(a)(1)) |
| --- |
| Interest Payments to Super Senior & Insured Certificates (PSA § 4.02(a)(2)(A) |
| "Certificate Insurer Reimbursement Amount" (PSA § 4.02(a)(3)) |
| Interest Payments to Mezzanine Certificates (PSA § 4.02(a)(4)) |
| Principal Payments to Super Senior & Insured Certificates (PSA §§ 4.02(a)(5)(A)(1)(a)(i), (b)(i), (c)(i), (d)(i)) |
| "Certificate Insurer Reimbursement Amount" (PSA §§ 4.02(a)(5)(A)(1)(a)(ii), (b)(ii), (c)(ii), (d)(ii), 4.02(a)(5)(A)(2)) |
| Principal Payments to Mezzanine Certificates (PSA § 4.02(a)(5)(A)(3)) |
| Other Principal Payments Owed to Certificates (Up to Overcollateralization Maintenance Amount) (PSA § 4.02(a)(6)) |
| Other Excess Cashflow Liabilities (PSA § 4.02(a)(7)) |
| Compensation for Super Senior Certificates' Principal Losses (Reimbursement for Realized Losses) (PSA § 4.02(a)(8)) |
| Compensation for Insured Certificates' Principal Losses (Reimbursement for Realized Losses) (PSA § 4.02(a)(8)) |
| "Certificate Insurer Reimbursement Amount" (PSA §§ 4.02(a)(8)(a), (b), (c); 4.02(a)(9)) |
| Other Excess Cashflow Liabilities (PSA §§ 4.02(a)(10)-(15)) |

(Wales Br. (Dkt. No. 60) at 15)

Assured argued in ESM Fund that it was entitled to full reimbursement of all claims paid to holders of the Insured Certificates at the first of the seventeen steps in the waterfall at which it was entitled to a distribution. See ESM Fund, 785 F. Supp. 2d at 194.

Given the structure of the MARM 2006-OA2 waterfall, the ESM Fund court found that

Assured's interpretation of the PSA would render significant portions of the waterfall entirely

superfluous and effectively subordinate the most senior certificates to the Insured Certificates.

Id. at 195-97.  The court reasoned that the

> payment waterfall provides for Assured to be paid at 17 different points, each
> immediately following a step in the waterfall that would have provided payment –
> either of interest or of principal – to the holders of Insured Certificates, had they
> not given up their right to it.  Assured's interpretation would render the 16 steps
> that follow [the first step at which it is entitled to payment] in the waterfall
> meaningless, as Assured would be fully reimbursed at [the first step].  Assured's
> suggestion that this is an intentional "belt and suspenders" approach is not
> convincing.  The Court has been unable to construct a scenario in which Assured
> would receive a payment through any of the 16 steps that follow [the first step].
> Furthermore, Assured provides no other explanations as to why each payment to
> Assured should directly follow a payment to the Insured Certificates.

Id. at 196.

> The court also determined that

> [i]f Assured's interpretation were correct, then the Super Senior certificates would
> be structurally subordinated to the Senior Support certificates through the
> operation of the Policy and the payment waterfall.  Because the Senior Support
> holders would be paid out in full by the Policy, and Assured would be paid back
> in full before the Super Senior certificates are repaid, when the Trust experiences
> losses, Super Senior holders would bear the losses first, with Assured bearing
> losses only if the Super Senior principal is completely wiped out.

Id.  Accordingly, the ESM Fund court found that the only reasonable interpretation of the PSA in

that case was that it provided Assured only with a right of subrogation.  Id. at 197.

This Court has no quarrel with the reasoning of ESM Fund, but a different result

is called for here because the language of the waterfall provisions is different.

The primary difference between the MARM 2006-OA2 waterfall and the

waterfalls at issue here is that the MARM 2006-OA2 transaction contained only a single

waterfall, in which all funds were pooled into a single pot of "Available Funds" and then

distributed.  See id. at 199.  Here, by contrast, the MARM 2007-3 transaction contains three

distinct waterfalls for each Loan Group.  Within each waterfall, the PSA provides for payment

from distinct Groups and Subgroups of mortgage loans, and within each Group and Subgroup,

from distinct pots of Interest and Principal Funds.  This key difference has two major

consequences here for purposes of interpreting the PSA:  (1) it renders meaningful each point at

which Assured is entitled to a distribution, as the source of the funds for the distributions is

different in each instance; and (2) it prevents the effective subordination of higher-priority

certificates to Assured or the lower priority Insured Certificates, as Assured will never be entitled

to reimbursement for claims paid with respect to lower priority certificates until the higher

priority certificates have been paid in full.

    At each stage in which Interest or Principal Funds from a particular Group or

Subgroup of loans might be used to reimburse Assured for claims paid as to a class of certificates

corresponding to a different Group or Subgroup of loans – or to a class with lower payment

priority than the Super Senior Certificates – the classes of certificates corresponding to the given

Group or Subgroup of loans – including the Super Senior Certificates – will always be paid in

their entirety before Assured receives any reimbursement from those funds.

    For example, Assured could only be reimbursed for claims paid as to interest on

Class 1-1 Certificates out of the Subgroup 1-1 Principal Funds after the principal balances on the

Class 1-1 Certificates (including the Super Senior Certificates) are paid down to zero.  See PSA

§ 4.02(b)(A)(1)(a)(i)-(ii) (providing for distributions from "the Principal Funds for Loan Group 1

. . . in an amount up to the Subgroup 1-1 Principal Distribution Amount . . . first . . . to the

Subgroup 1-1 Certificates . . . until their respective Class Principal Balances are reduced to zero .

. . [and] second, to the Certificate Insurer, up to the Subgroup 1-1 Certificate Insurer

Reimbursement Amount"). Similarly, claims paid as to principal on Class 1-2 Certificates will only be reimbursed from Loan Subgroup 1-1 Interest Funds if there are any such funds remaining after the Class 1-1 Certificates (including the Super Senior Certificates) receive the full amount of interest to which they are entitled. See PSA § 4.02(a)(1)(A)(b)(i) (providing for distributions from "Interest Funds for Loan Subgroup 1-1 . . . to each Class of Subgroup 1-1 Certificates" up to the total interest owed to those certificates); PSA § 4.02(a)(2)(B)(b) (providing for distribution to Assured "from the remaining Interest Funds for Loan Group 1" after the sequentially higher distributions, including of the Interest Funds for Loan Subgroup 1-1 to the Class 1-1 Certificates) (emphasis added). Accordingly, nowhere in the Principal Funds or Interest Funds waterfalls would Assured or any lower-priority certificate effectively be entitled to a distribution ahead of a higher-priority class of certificates as to any given Group or Subgroup of loans.

Wales also argues that "allowing Assured to obtain . . . principal reimbursement payments from available Interest Funds would divert funds that would otherwise flow to the Excess Funds Waterfall for distribution to the holders of the Super Senior Certificates." (Wales Br. (Dkt. No. 60) at 23) According to Wales, this would "exacerbate the absurd result . . . of the subordination of the interests of the holders of the Super Senior Certificates to those of the holders of the Insured Certificates." (Id.) While Wales is correct that the PSA is generally written to ensure that the holders of Super Senior Certificates are the most likely – of all certificate holders – to receive their full scheduled distributions, nothing in the PSA requires that at all points in the waterfall Super Senior Certificates have higher priority than all other certificates. Indeed, the express language and structure of the governing documents belie any such contention. The Prospectus Supplement, for example, states that "[t]he rights of the holders

of the mezzanine certificates to receive distributions will be subordinated, to the extent described in this prospectus supplement, to the rights of the holders of the related senior certificates." (Prosp. Supp. at 22 (emphasis added))  The Prospectus Supplement also warns investors that it "cannot assure [investors] that sufficient interest will be generated . . . to create or maintain the required level of overcollateralization" (id.) – i.e., that holders of Super Senior Certificates are not guaranteed any distributions within the Net Monthly Excess Cashflow waterfall.

Moreover, within the Net Monthly Excess Cashflow waterfall, the PSA contemplates that Super Senior Certificates will be subordinate to certain classes of certificates that Wales argues they must always be superior to.  For example, the mezzanine certificates are entitled to interest payments from the Net Monthly Excess Cashflow waterfall before the Super Senior Certificates are entitled to Unpaid Realized Loss Amounts.  (PSA § 4.02(c)(2)-(3))  If distributions to Assured at the steps in the Interest Funds waterfall – sequentially above the Net Monthly Excess Cashflow waterfall – constitute an impermissible subordination of the Super Senior Certificates, then surely distributions to the even more junior mezzanine certificates would also be impermissible.  But this argument has not been made by Wales, and could not be sustained given the structure of the waterfall.  Accordingly, the fact that Assured's interpretation may result in less funds reaching the Net Monthly Excess Cashflow waterfall does not mean that the Super Senior Certificates are impermissibly subordinated and, therefore, does not require this Court to accept Wale's interpretation of the governing documents.

Nothing in ESM Fund mandates such a result either.  The concern in ESM Fund was that Assured, and thereby even the lowest-priority Insured Certificates, would effectively be granted a higher priority with respect to principal payments than the Super Senior Certificates, because Assured would be entitled to the full reimbursement for all claims it had paid as to

principal at a step in the waterfall above the point at which any of the Super Senior Certificates would receive their principal distributions. See ESM Fund, 785 F. Supp. 2d at 199-200 (noting that the MARM 2006-OA2 waterfall provides for distributions sequentially "to each Class of Senior Certificates . . . up to the Current Interest and Interest Carry Forward Amount," then "to the Certificate Insurer, up to the Aggregate Certificate Insurer Reimbursement Amount," and only later in the waterfall "to the Group 1 Certificates . . . until their respective Class Principal Balances are reduced to zero."). Were Assured entitled to full reimbursement for all claims at this first step in the MARM 2006-OA2 waterfall, this would effectively bootstrap any lower priority Insured Certificates all the way up the waterfall to the first step at which Assured would be entitled to reimbursement. This result, the court concluded, could not be what the drafters intended.[13] See ESM Fund, 785 F. Supp. 2d at 195-96. Because of the substantive differences between the waterfall provisions here and the waterfall provision in ESM Fund, that result is not possible here, and for this reason the concerns expressed by the ESM Fund court do not apply here.

The ESM Fund court also expressed concern that "Assured's interpretation would render the 16 steps that follow [the first step at which it is entitled to payment] in the waterfall meaningless, as Assured would be fully reimbursed at [the first step]." Id. at 196. This result

---

[13] The ESM Fund court found that if the Super Senior Certificates were subordinated in this manner, they might no longer be eligible investments for ERISA plans, as ERISA-eligible certificates may not be "subordinated to the rights and interests evidenced by other certificates of the same mortgage pool." ESM Fund, 785 F. Supp. 2d at 195 (citation and quotation marks omitted). Wales argues that the same problem is present here, because the Super Senior Certificates are designated as ERISA-eligible. (Wales Br. (Dkt. No. 60) at 21-23) As discussed above, however, the Super Senior Certificates would not be subordinated to any certificates over which the PSA otherwise provides them a higher priority. Within each Group or Subgroup of Loans – and with respect to the funds generated by those loans – neither Assured nor any lower-priority certificate is entitled to a distribution before the Super Senior Certificates. Accordingly, the ESM Fund court's concern regarding ERISA eligibility is not applicable here.

would arise because each distribution in the MARM 2006-OA2 waterfall came out of a single,

co-mingled pool of "Available Funds." Id. at 199. Here, by contrast, at each point at which

Assured is entitled to reimbursement, that reimbursement would be derived from a different

source of funds. Compare, e.g., PSA § 4.02(a)(2)(B)(b) (reimbursement "from the remaining

Interest Funds for Loan Group 1 . . . up to . . . the Group 1 Certificate Insurer Reimbursement

Amount") to PSA § 4.02(b)(A)(1)(a)(ii) (reimbursement from "the Principal Funds for Loan

Group 1 . . . in an amount up to the Subgroup 1-1 Principal Distribution Amount" for "the

Subgroup 1-1 Certificate Insurer Reimbursement Amount") and PSA § 4.02(b)(A)(1)(b)(ii)

(reimbursement from "the Principal Funds for Loan Group 1 . . . in an amount up to the

Subgroup 1-2 Principal Distribution Amount" for "the Subgroup 1-2 Certificate Insurer

Reimbursement Amount"). Accordingly, in the instant case, interpreting the PSA to provide

Assured with a right of reimbursement would not render significant portions of the waterfalls

meaningless.

   For all of these reasons, ESM Fund provides no basis for this Court to rule that

the only reasonable interpretation of the MARM 2007-3 payment waterfalls is that Assured's

right of repayment is limited to subrogation.

## III.   PUBLIC POLICY CONCERNS DO NOT REQUIRE THIS COURT TO ACCEPT WALES'S INTERPRETATION OF THE GOVERNING DOCUMENTS

   Wales argues that "Assured's claim that . . . the PSA bestows upon Assured an

additional general right of reimbursement is inconsistent with the very essence and purpose of

[an insurance] [p]olicy." (Wales Br. (Dkt. No. 60) at 25) According to Wales,

> [i]f Assured's position were given effect, the basic nature of this financial
> arrangement would be transformed from insurance to a loan facility, under which
> Assured would be, in effect, making revolving one-month loans for which it
> would be entitled to repayment in the following month. Such an arrangement is

contrary to the entire concept of "insurance." In fact, it is contrary to the well-settled public policy under New York law that prohibits an insurance company from funding insurance obligations with monies provided by the insured.

(Id.)

The contention that "Assured's interpretation virtually guarantees that Assured will promptly be reimbursed for all claims it pays under the Policy" (id. at 26) presents a factual question that cannot be resolved on a Rule 12(c) motion. Indeed, the parties allege facts in their briefing that present contradictory scenarios. See id. ("As of the closing date for the MARM 2007-3 transaction, the Trust was secured by approximately $2.57 billion in mortgage loans, which was approximately three times more than the aggregate amount of Insured Certificates . . . covered by the Policy issued by Assured."); Assured Br. (Dkt. No. 67) at 34 ("Assured bears a substantial amount of risk on the Policy, even when its reimbursement right is taken into account. Indeed, the reimbursement amounts placed into escrow over the course of this litigation will not come close to fully reimbursing Assured for claim payments made during the litigation's pendency."). Accordingly, even assuming arguendo that public policy would prohibit Assured from maintaining a general reimbursement right, there are factual issues that cannot be resolved by this Court on the instant motion.

Finally, there is no merit to Wales's contention that providing Assured a general reimbursement right "is contrary to the well-settled public policy under New York law that prohibits an insurance company from funding insurance obligations with monies provided by the insured." (Wales Br. (Dkt. No. 60) at 25)

> Under New York law, an insurer that has paid on its insured's claim has the common law right to subrogation against the person who is responsible for the events underlying the claim. However, under the antisubrogation rule, an insurance company cannot recover from its own insured for the very risk for which the insured was covered. This exception is based on the public policy goals of preventing an insurer from passing a loss to its own insured, and

31

guarding against the potential for conflict of interest that may affect an insurer's incentive to provide a vigorous defense for its insured.

Liberty Mut. Fire Ins. Co. v. E.E. Cruz & Co., Inc., 475 F. Supp. 2d 400, 407 (S.D.N.Y. 2007) (internal citations and quotation marks omitted).

The anti-subrogation rule does not apply here. At no point is Assured entitled to "recover from its own insured" on any claim it pays under the insurance policy. Id. Rather, after it has paid a claim to the holder of an Insured Certificate, Assured is entitled to repayment from future cash flows from the mortgages underlying the MARM 2007-3 transaction. Whether that repayment comes solely in the form of subrogation or whether it also includes a more general right to reimbursement, at no point is Assured entitled to seek recovery from the holders of the Insured Certificates. Moreover, nothing in the pleadings suggests that any right of reimbursement held by Assured would entitle it to "pass[] a loss to its own insured." Id. In each instance, no matter the extent of Assured's reimbursement right, the insurance policy guarantees full payment of principal and interest to the holders of Insured Certificates. Accordingly, the anti-subrogation rule does not apply here, and public policy considerations do not require that this Court accept Wales's interpretation of the governing documents.

## CONCLUSION

For the reasons set forth above, Wales's motion for judgment on the pleadings (Dkt. No. 59) is denied. The Clerk of the Court is directed to terminate the motion.

Dated: New York, New York
       September 29, 2016

SO ORDERED.

Paul G. Gardephe
United States District Judge